IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
CHICAGO DIVISION

| | |
|---|---|
| MARIA WILLIAMS-BELL, on behalf of herself, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRITISH STANDARDS INSTITUTION, INC.,<br><br>Defendant. | Civil Action File No. 1:18-cv-05386<br><br>Honorable Joan B. Gottschall<br><br>JURY TRIAL DEMANDED |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant BSI Group America Inc. (improperly named as British Standards Institution, Inc.) (hereinafter, "BSI"), by its attorneys and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submits its Brief in Support of Its Motion for Summary Judgment.

Plaintiff Maria Williams-Bell's ("Plaintiff") only claim is that BSI failed to pay her overtime wages in violation of the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL"). It is BSI's position that Plaintiff is an exempt employee because her job duties as a lead auditor fall squarely under the administrative exemption of the FLSA and IMWL. In an effort to defeat her exempt classification, Plaintiff's complaint alleges that she does nothing more than check off boxes from procedures described in manuals provided by BSI. However, Plaintiff's argument is undermined by her own deposition testimony. In reality, Plaintiff acknowledges that (1) extensive knowledge and years of industry experience is an essential qualification of a lead auditor, (2) she performed work directly related to the management or general business operations of BSI's customers, and (3) she exercised discretion and independent judgment with respect to matters of significance. Because the undisputed record evidence

01528731-1

demonstrates that Plaintiff was properly classified as exempt under the administrative exemption, BSI respectfully requests that the Court grant its Motion for Summary Judgment.

## I. BRIEF FACTUAL BACKGROUND

BSI's Quality Assurance Group is an accredited certification registrar for ISO 9001 quality management system standards, which are developed and maintained by the International Organization for Standardization ("ISO"). (Ex. A, Plaintiff's Deposition Transcript ("Plf. Tr.") 23:12-14, 35:9-14, 70:21-71:20, 81:5-10; Ex. B, Timothy G. Green Declaration ("Green Dec.") ¶ 3 (SOF 5-7); Ex. C, Timothy G. Green Deposition Transcript ("Green Tr.") 79:20-22;.) ISO is responsible for developing quality management standards and the ISO 9001 certification demonstrates that an independent objective assessment of the client's management systems has been conducted and that the client is achieving the policies and objectives of that management system. (Ex. A, Plf. Tr. 23:15-17, 28:2-11; 160:12-161:4 (SOF 8, 18).) ISO 9001 ensures that a company has control over its essential processes and encompasses management's responsibility for everything related to the product or service the client is selling. (*Id.* 28:12-29:8 (SOF 10-11.) ISO Certification is important for many reasons, one of which is that many of the customers of BSI's clients require the certification to do business in their industry. (*Id.* 160:3-11; Ex. B, Green Dec. ¶ 7 (SOF 17).)

As an ISO registrar, BSI is regulated and certified by a certifying body and authorized to certify companies that comply with the rigorous ISO 9001:2015 standard. (Ex. A, Plf. Tr. 27:20-28:1, 29:9-13; 70:21-71:9, 71:21-72:11 (SOF 7, 32).) Plaintiff joined BSI in September 2017 and worked as an ISO 9001 lead auditor until she voluntarily resigned her employment on February 28, 2018. (*Id.* 42:25-43:1, 53:5-10, 79:19-22, 216:8-10 (SOF 1).) BSI refers to each auditor internally as a Client Manager ("CM") because he/she is responsible for not only conducting the client audits, but is responsible for managing the client relationship as well. (*Id.* 44:25-45:21, 46:12-16, 52:21-

01528731-1

53:10, 89:10-25, 93:25-94:11, 95:3-21; Ex. C, Green Tr. 80:10-19 (SOF 4, 28-31).)

BSI hired Plaintiff as a provisional ISO 9001 auditor and fast tracked her because of her resume, which included more than a decade of experience as an ISO 9001 lead auditor. (Ex. A, Plf. Tr. 65:7-12, 21:23-22:3, 22:14-20, 26:7-8, 16-19, 26:20-27:11, 34:2-19, 36:18-25; Ex. D, Plf. Tr. Ex. 1 (SOF 19, 61-67).) Plaintiff was re-certified as a lead auditor for ISO 9001:2015 and completed industry exams[1] in the areas of quality management systems and management systems. (Ex. A, Plf. Tr. 73:7-14, 74:1-5, 74:18-75:23, 77:18-21, 91:2-16, 92:23-25; Ex. F, Plf. Tr. Ex. 10 (SOF 21, 23).) Aside from choosing and taking industry exams that she was qualified for (notably she declined to take several in which she was not qualified), Plaintiff also attended a 5-day lead auditor training course and took some online training modules during her first few weeks of employment with BSI. (*Id.* 65:17-66:11, 73:7-14, 74:1-5, 74:18-75:23, 76:14-77:6, 77:18-21, Ex. E, Plf. Tr. Ex. 7 (SOF 20 -22).)

## II. ANALYSIS AND CITATION OF AUTHORITY

### A. Standard Of Review.

The moving party carries the initial burden of production to identify "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party may discharge this burden by "pointing out … that there is an absence of evidence to support the nonmoving party's case." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). An issue is not genuine if it is unsupported by evidence or created by evidence that is "merely colorable" or "not significantly

---

[1] To conduct audits of companies in a certain industry, a CM must first pass the relevant competency exam for that industry, which is only possible if the CM has sufficient experience and knowledge of that industry. (Ex. A, Plf. Tr. 35:19-36:4, 18-25, 37:1-2, 66:12-24, 74:6-10, 75:5-12; Ex. B, Green Dec. ¶ 6 (SOF 14-15).)

01528731-1

probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Once the movant has met its initial burden of production, "the non-movant [] must make a showing sufficient to establish any essential element for which she [] will bear the burden of proof at trial" by setting "forth specific facts showing that there is a genuine issue for trial." *Spitz v. Proven Winners N. Am., LLC*, 969 F. Supp. 2d 994, 998 (N.D. Ill. 2013) (citing *Outlaw*, 259 F.3d at 837). "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party….' *Id.* (citations omitted).

### B. Plaintiff's FLSA and IMWL Claims Fail As A Matter Of Law.

The FLSA[2] requires a covered employer to pay non-exempt employees overtime compensation for all hours worked in excess of 40 hours in a workweek "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. 207(a)(1). However, the FLSA provides a complete exemption from this overtime pay requirement for "any employee employed in a bona fide executive, administrative, or professional capacity . . . ." 29 U.S.C. 213(a)(1). The employer bears the burden of proving an employee is exempt under the FLSA. *See Deschepper v. Midwest Wine & Spirits, Inc.*, 84 F. Supp. 3d 767, 777 (N.D. Ill. 2015). In 2018, the Supreme Court held that courts must now read the exemptions to the Fair Labor Standards Act ("FLSA") "fairly" rather than "narrowly" as some courts had previously done. *Encino Motorcars, LLC v. Navarro*, 38 S. Ct. 1134, 1142, 200 L. Ed. 2d 433 (2018).

---

[2] "Given the common purpose and similar language of the FLSA and the IMWL, courts analyze both statutes the same." *Torres v. Nation One Landscaping, Inc.*, 2016 U.S. Dist. LEXIS 167232, *10 (N.D. Ill. Dec. 5, 2016). Further, "[a] violation of the IMWL is contingent on establishing a violation under the FLSA." *Shammo v. Kanzaman, Inc.*, 2015 U.S. Dist. LEXIS 5376, *5 (N.D. Ill. Jan. 15, 2015)(citing *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 376 (7th Cir. 2005)).

01528731-1

Here, reading the administrative exemption fairly, Plaintiff was properly classified as exempt under the administrative exemption because she was "compensated on a salary or fee basis at a rate of not less than $455 per week" and her primary duty was (a) "the performance of … non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (b) include[d] the exercise of discretion and independent judgment with respect to matters of significance." *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 103, (N.D. Ill. 2013) (*citing* 29 C.F.R. § 541.200(a)).

### (1) Salary Basis Test

BSI can establish the minimum salary requirement because it is undisputed that BSI paid Plaintiff a fixed annual salary of $63,000[3], which equates to a weekly salary of approximately of $1,250. (Ex. A, Plf. Tr. 50:18-25, 52:6-20 (SOF 68-70).)

### (2) Plaintiff's Primary Duties Were Non-Manual and Related To The Management Of The General Business Operations Of BSI's Clients.

To establish the second prong of the administrative exemption, BSI must show that Plaintiff primarily performed office or non-manual duties directly related to "the management or general business operations" of BSI or its customers. 29 C.F.R. § 541.200(a)(2).

#### (a) Plaintiff Performed Non-Manual Duties

Plaintiff readily admits that her primary duties included auditing BSI's clients and managing the client relationship with the clients that she audited. (Ex. A, Plf. Tr. 44:25-45:21 (SOF 28).) The specific tasks that Plaintiff performed in fulfilling her primary duties were non-manual and included coordinating with clients throughout the audit process, preparing audit plans, analyzing the clients' quality management systems and other processes, identifying areas of

---

[3]BSI paid Plaintiff a fixed starting salary of $58,000 per year, but increased her annual salary to $63,000 within a few weeks of beginning her employment, after she completed her new hire training and received her lead auditor certification. (Ex. A, Plf. Tr. 50:18-25 (SOF 68-69).)

01528731-1

improvement, identifying nonconformances, determining whether to accept or reject a client's corrective action plan, preparing and reviewing audit reports, recommending ISO 9001 certification, and scheduling subsequent audits with the clients. (*Id.* 27:20-28:1, 29:9-13, 45:10-21, 61:12-23, 69:9-70:2, 89:10-25, 93:25-94:11, 95:3-21, 106:9-18, 108:22-109:1, 157:5-11, 89:10-22, 108:22-109:13; 149:5-12; 151:19-152:17; 167:22-168:2 (SOF 30, 32, 33, 35, 36, 42, 43, 51, 53, 57, 58, 71.) There can be no dispute that her duties were non-manual. *See e.g., Mullins v. Target Corp.,* 2011 U.S. Dist. LEXIS 39997, at *13 (N.D. Ill. April 13, 2011) (finding plaintiff's duties were non-manual where she analyzed data and conducted investigations).

(b) Plaintiff's Duties Related To The Management And General Business Operations Of BSI's Clients

BSI satisfies the second prong of this analysis because it can show that Plaintiff's primary duty was the "performance of work directly related to the management or general business operations of [BSI's] customers." 29 C.F.R. § 541.201(a), (c). "To meet this test, 'an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.'" *Mullins*, 2011 U.S. Dist. LEXIS at *11 (citing 29 C.F.R. § 541.201(a)). Such work includes work in functional areas such as, among others, **auditing**, budgeting, quality control, purchasing, procurement, advertising, marketing, safety and health, personnel management, human resources, data base administration, legal and regulatory compliance, and similar activities. 29 C.F.R. § 541.201(b).

Although it does not appear that courts in this jurisdiction have had an opportunity to analyze whether an employee responsible for auditing the business operations and processes of her employer's client meets the second prong of the administrative exemption, the U.S. District Court for the Northern District of Texas recently had just such an opportunity. *See Owens v. Neovia*

01528731-1

*Logistics, LLC*, 2019 U.S. Dist. LEXIS 54337 (N.D. Tex. March 14, 2019); accepted by *Owens v. Neovia Logistics*, LLC, 2019 U.S. Dist. LEXIS 53189 (N.D. TX March 28, 2019). In *Owens*, the plaintiff worked as a Continuous Improvement Supervisor for the defendant employer, which marketed cost saving solutions for its clients' logistics operations through increased efficiency of facility operations and processes. *Id.* at *2. Similar to Plaintiff here, the *Owens'* plaintiff "was knowledgeable about various logistics methodologies, having spent 25 years in the industry" and had "obtained a certification which demonstrated his mastery of these principles after successfully completing an 80-hour curriculum [and] passing a comprehensive test." *Id.* at *4. A portion of the plaintiff's "job was to analyze the operations of various client facilities and determine how to improve those operations, including changing morale, and reducing safety problems and costs, with efficiency being a 'byproduct' of that process." *Id.* at *4. Similar to Plaintiff's duties here, the primary duties of the *Owens'* plaintiff involved working "to improve operational standards and existing processes and involved [] inspecting and auditing to determine if operational processes were in alignment with prescribed … certification standards, procedures and guidelines which were very strict and detail oriented." *Id.* at *5. Indeed, one such project involved "taking a facility to ISO certification within four months." *Id.* at *7. In holding that the employee's work qualified as "exempt work," the *Owens'* court found that "[p]laintiff's work with [d]efendant's clients involved, among other things, audits and quality control [and that] [s]uch activities constitute "[w]ork directly related to management or general business operations[.]"[4] *Id.* at *17 (citations omitted.)

As in *Owens*, Plaintiff was responsible for auditing a client's quality control objectives, which she did by sampling relevant data for whatever period she deemed relevant to analyze

---

[4] The *Owens'* court determined that Plaintiff was exempt under the administrative exemption on alternate grounds as well. More specifically, "[b]ecause Plaintiff's job involved determining how to make Defendant's customers' businesses run more efficiently, he can properly be designated as an adviser/consultant, and is thus exempt under that measure as well." *Owens*, 2019 U.S. Dist. LEXIS at *n7.

01528731-1

whether the client was properly monitoring and measuring the objectives. (Ex. A, Plf. Tr. 114:9-13, 152:24-153:10 (SOF 44).) In addition to analyzing quality control processes, Plaintiff also audited many of the other functional areas identified in the regulations. *See* 29 C.F.R. § 541.201(b). Indeed, the very essence of Plaintiff's job was to audit the quality management systems of BSI's clients in various industries to ensure they complied with the ISO 9001 certification standard by taking a deep dive into various processes, including quality control, purchasing and procurement; quality management; safety; risk management; and resource management, which included human resources, infrastructure, and the work environment. (Ex. A., Plf. Tr. 27:20-28:1, 29:9-30:19, 82:7-83:7 (SOF 32, 37)) Plaintiff also audited the legal and regulatory processes of BSI's clients by conducting a "surface review" of those processes. (*Id.* 30:7-19 (SOF 38).)

Bottom line, not only does Plaintiff admit that she was auditing BSI's clients, but she admits that she was auditing many of the functional areas identified in 29 C.F.R. § 541.201(b).[5] (Ex. A Plf. Tr. 27:20-28:1, 29:9-30:19, 30:7-19, 82:7-83:7 (SOF 32, 37, 38).) Thus, when as here, an employee's primary duties are non-manual and directly related to assisting with the running or servicing of the business of an employer's clients, the second prong of the administrative exemption has been satisfied. *See, e.g., Owens*, 2019 U.S. Dist. LEXIS at 17.

        **(3)    Plaintiff Routinely Exercised Discretion And Independent Judgment In Performing Her Primary Duties.**

To satisfy the third prong of the administrative exemption, BSI must show that Plaintiff's primary duties involved "the exercise of discretion and independent judgment with respect to matters of significance." *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 577 (7th Cir. 2012)

---

[5] In addition, Plaintiff assisted BSI's clients with the running or services of their business by making "sure that clients understood what they were required to do. And when they weren't doing that or when they weren't meeting the requirements, [she] did not hesitate to document those in … [a] nonconformance[] so that they could correct those issues and, one, meet the requirements but, two, become a better organization for their own good and for the good of their customers." (Ex. A, Plf. Tr. 58:3-11 (SOF 56).)

01528731-1

(*citing* 29 C.F.R. § 541.200(a)(3)). BSI can readily satisfy this burden as the undisputed material facts demonstrate that Plaintiff routinely exercised discretion and independent judgment at each stage of the audit process and that her work as an ISO 9001 auditor related to matters of significance for BSI and its clients.

First, it is undisputed that conducting an ISO 9001 audit of BSI's clients necessarily required Plaintiff to ensure that the clients' operations and processes were in conformance with the ISO 9001 standard. (Ex. A, Plf. Tr. 80:20-81:4 (SOF 9).) Absent such conformance, BSI, which is an ISO 9001 certification body, could not issue the ISO 9001 certification to its clients. (*Id.* 155:1-22, 157:5-11 (SOF 53-54).) This reality neither undermines the significance of Plaintiff's work nor suggests that she was doing nothing more than applying well-established techniques, procedures, or specific standards. 29 C.F.R. § 541.202(e) (satisfying third prong requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."). To the contrary, Plaintiff admitted that CMs must have experience and knowledge in a particular industry in order to even pass the competency test to become certified to conduct audits in that industry. (Ex. A, Plf. Tr. 35:19-25, 36:1-4, 18-25, 37:1-2 (SOF 15).) In fact, when BSI initially hired Plaintiff, she refused to take the construction and military competency exams (T Code)[6] because she lacked the requisite industry knowledge and experience to pass them. (*Id.* 76:14-77:6; Ex. E, Plf. Tr. Ex. 7 (SOF 22).) Conversely, within about two weeks of starting work for BSI, Plaintiff readily passed the competency exam for seven other industries because she had the requisite knowledge of, and more than a decade of experience in, those industries. (*Id.* 73:7-

---

[6] BSI uses a technical code ("T Code") system to categorize its clients into different industries or sectors, which is the essentially the same as the SIC and EA codes that are used by other ISO 9001 registrars. (Ex. A, Plf. Tr. 31:15-32:7; 66:21-24, 74:6-17 (SOF 12.).) BSI assigns each client a T Code based on the business activities it performs, such as plastics, paper, chemical, metals, etc. (*Id.* at 74:6-17 (SOF 12.).)

14, 74:1-5, 74:18-75:23, 77:18-21; Ex. E, Plf. Tr. Ex. 7 (SOF 21).)

If conducting an audit simply required CMs to rotely follow an audit manual or the ISO 9001 standard as Plaintiff now contends, relevant knowledge and experience would not be necessary. (Compl. at ¶ 14.) Such is not the case, however, as Plaintiff's own testimony makes clear. Moreover, "[t]he fact that an employee must follow standard procedures and guidelines does not indicate the lack of professional discretion and judgment." [7]

>     (a)   Plaintiff Routinely Exercised Discretion And Independent Judgement At Each Stage Of The Audit Process.

The relevant analysis in determining whether an employee exercises discretion and independent judgment is whether she compares and evaluates possible courses of conduct and acts after considering the various possibilities. *See Schaefer-LaRose*, 679 F.3d at 580-581 (finding sales representatives exercised significant discretion and independent judgment even though employer gave them precise wording and materials because they were tested on their substantive knowledge, had minimal supervision when visiting physicians, were required to "tailor their messages to respond to the circumstances, whether those be the time or attention constraints from the physician or the concerns and objections that are voiced during a particular or previous visit"). Here, as discussed below, Plaintiff regularly evaluated possible courses of conduct and acted in accordance thereof at each stage of the audit process.

---

[7] *See Owens*, 2019 U.S. Dist. LEXIS 54337, at *21-22 (finding employee who conducted audits of his employer's clients exercised discretion and independent judgment "even if [he] worked with a standard 'toolbox' of continuous improvement methodologies [because] he still exercised his independent judgment in determining which methodologies to use in each circumstance, as well as when and how to use them."); *see Schaefer-LaRose*, 679 F.3d at 577, 580-581 (finding sales representatives exercised significant discretion and independent judgment despite the constraints placed on them by the regulatory environment in the pharmaceutical industry)(*citing Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374-75 (7th Cir. 2005)("noting that the presence of strict regulatory limits channeling employee discretion did not prevent exercise of independent judgment"); *Mullins*, 2011 U.S. Dist. LEXIS at *24-25 (plaintiff's extensive training and use of the directives that investigators were expected to follow does not imply a lack of discretion or judgment).

01528731-1

First, prior to conducting an audit, Plaintiff was responsible for developing an audit plan, which "is a detailed schedule of what will be reviewed" during the audit and "identifies the processes that will be reviewed, the people that will be interviewed, [and] the clauses and elements [of the ISO 9001 Standard] that are related to those processes." (Ex. A, Plf. Tr. 106:9-18 (SOF 33).) Plaintiff had to consider "many, many different factors" when developing an audit plan, including, but not limited to, previous audit findings and noncomformances (which are areas that do not conform with the ISO 9001 standard or the client's own requirements), time management to ensure she allowed sufficient time for each process, availability of key employees to ensure she could interview relevant members of the management team and other employees, and the length of the audit. (*Id.* 109:8-110:25, 111:5-13 (SOF 34).) When determining which employees to interview, Plaintiff analyzed the client's processes to determine the relevant individual within each such process, which typically included managers and directors, so that she could "get an overall review of how the process works." (*Id.* 153:15-24 (SOF 48).) Plaintiff also interviewed a sampling of the employees doing the day-to-day work to ensure they were following the processes. (*Id.* 154:25-155:9 (SOF 49).)

Plaintiff's exercise of discretion and independent judgment was readily on display when she conducted the actual on-site audit. Depending on the size and complexity of the client's organization, Plaintiff either conducted the audit alone or as part of an audit team. (*Id.* 161:16-24 (SOF 24).) Either way, Plaintiff operated with very little oversight when conducting audits because she did not have day-to-day contact with her direct supervisor and generally only communicated with her by telephone or e-mail about once a week. (*Id.* 163:17-25, 165:1-4 (SOF 26).) Working with little immediate supervision, such as Plaintiff did, is one indicator of discretion and independent judgment. *See, e.g., Mullins*, 2011 U.S. Dist. LEXIS at *21-24 (finding employee exercised discretion and independent judgment, in part, because she made choices and decisions

01528731-1

that were free from *immediate* supervision and direction); *Owens*, 2019 U.S. Dist. LEXIS at 22 ("Plaintiff's independence is further underscored by the fact that he had little oversight from his supervisors, who were rarely on site"). Moreover, when designated as the lead auditor for an audit team, Plaintiff supervised the audit and made assignments to the other CMs, which clearly required her to exercise discretion and judgment. (Ex. A, Plf. Tr. 161:12-14, 162:14-19 (SOF 25).)

When conducting full certification or recertification audits, Plaintiff analyzed every process within the organization, which required her to exercise discretion and independent judgment by, among other things, taking into consideration the client's "experience, the longevity of their certification … [and] special circumstances that an organization may be going through in terms of their readiness and their compliance." (*Id.* 57:13-21, 108:22-109:1(SOF 35, 55).) She also exercised discretion and independent judgment when analyzing the various processes within a client's operations. For instance, when Plaintiff audited the internal support functions of BSI's clients, she analyzed various resources within the organization, which might include its employees; infrastructure; buildings; equipment; and/or the social, psychological and physical environment to make a determination as to whether, for example, employees felt safe, the work environment was comfortable, and the client was using the proper equipment to ensure the product met specific requirements. (*Id.* 116:3-117:16 (SOF 47).)

When auditing a client's risk management processes, Plaintiff used discretion and judgment and her knowledge of the industry to determine whether (a) changes that occurred within an organization were controlled and happening according to a predetermined plan, (b) the changes were properly communicated, (c) proper resources were in place for the change, (d) the client was tracking the effectiveness of the change, and (e) the change was meeting specified requirements. (*Id.* 114:20-115:6, 84:9-85:4, 87:5-17 (SOF 45, 46).) Analyzing evidence in order to make such determinations is indicative of exercising discretion and independent judgment. *See e.g., Roe-*

01528731-1

*Midgett v. CC Servs.*, 512 F.3d 865, 874 (7th Cir. 2008)(finding that although material damage appraisers for insurance companies did not make final liability decisions, they exercised discretion and independent judgment by "verify[ing] whether the actual damage is consistent with the claimed damage … evaluat[ing] whether the damage is likely preexisting, inconsistent with the alleged cause, or otherwise suspicious …[and] using their knowledge and experience to distinguish covered damage from fraudulent or preexisting damage.")

Plaintiff also exercised discretion and independent judgment at the conclusion of an audit when she decided whether or not the client was in conformance with the ISO 9001 standard and/or the client's own requirements. (*Id.* 61:12-23 (SOF 51).) Plaintiff acknowledged that as "an experienced auditor, [she] had a good eye for what was conforming and what wasn't conforming," which refutes any suggestion that she could make an effective determination about conformance by simply following a manual, and further underscores her use of discretion and independent judgment when making such determinations. (*Id.* 58:18-20 (SOF 41).) That Plaintiff relied on her own discretion and judgment also is bolstered by the fact that she did not rotely follow the findings of the CM who conducted a previous audit on the same client. Instead, if Plaintiff determined that a client's process was not meeting the relevant standard, she issued a noncomformance and required the client to address the issue even though the previous CM had opted not to do so. (*Id.* 61:12-23, 63:6-12 (SOF 51-52).)

When Plaintiff decided to issue a noncomformance, the client was required to submit a corrective action plan to her describing how it was going to fix the noncomformance. (*Id.* 157:5-11 (SOF 53).) Probably nowhere was Plaintiff's exercise of discretion and independent judgment more evident than at this stage of the audit process as Plaintiff was solely responsible for either "approving or disapproving" the client's corrective action plan. (*Id.*) Her decision in this regard was critical, and thus a matter of significance, because BSI could not issue an ISO certification or

01528731-1

recertification unless the auditor approved the client's proposed corrective action plan. (*Id.* 155:1-22 (SOF 54).) Moreover, BSI's customers relied on the certification for their business. (*Id.* 30:21-25, 160:3-11; Ex. B, Green Dec. ¶ 7 (SOF 16-17).)

Plaintiff's final act requiring discretion and independent judgment occurred at the end of the audit process when she decided whether to recommend a client for ISO 9001 certification. After reviewing relevant records, observing the client's practices, interviewing key employees, and sampling their processes, Plaintiff was responsible for memorializing her audit findings and making a recommendation regarding certification to BSI's technical review committee, which then made the final certification decision. (Ex. A, Plf. Tr. 58:12-17, 69:16-18, 98:3-14; Ex. C, Green Tr. 69:9-70:2 (SOF 40, 57-59).) The fact that Plaintiff was not the final arbiter of the certification decision is of no consequence because the law does not require that an employee operate free from oversight. Indeed, "[t]he fact that an employee's decision may be subject to review … does not mean that the employee is not exercising discretion and independent judgment." *Schaefer-LaRose*, 679 F.3d at 578. Instead, as was the case here, "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.* (noting that a "management consultant who has made a study of the operations of a business and … has drawn a proposed change in organization [and has] the plan reviewed or revised by superiors before it is submitted to the client" acts with discretion and independent judgment); *Owens*, 2019 U.S. Dist. LEXIS at 21 (same)(citing 29 C.F.R. § 541.202(c)).

        (b)    <u>Plaintiff's Exercise Of Discretion And Independent Judgment Related To Matters Of Significance.</u>

"The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Mullins*, 2011 U.S. Dist. LEXIS at *25 (citing 29 C.F.R. § 541.202(a)) (finding plaintiff's work identifying and conducting investigations of fraud and theft at retail stores related

to matters of significance because "Target has a substantial interest in protecting its merchandise from theft, fraud," etc.). Not only did Plaintiff audit BSI's clients, but also she was the face of BSI to the clients she audited because she managed the business relationship with those clients and was their primary point of contact with BSI. (Ex. A, Plf. Tr. 45:4-21, 46:12-16, 80:20-81:4; Ex. C, Green Tr. 80:10-19 (SOF 9, 29, 31).) Thus, Plaintiff's work was undoubtedly a matter of significance for BSI. More importantly, Plaintiff's auditing work was a matter of significance to BSI's clients because not only does being ISO 9001 certified "help them get customers," but also some customers require BSI's clients to have the ISO 9001 certification in order to even do business with them. (Ex. A. Plf. Tr. 30:21-25, 160:3-11; Ex. B, Green Dec. ¶ 7 (SOF 16-17).) Courts routinely find that work which is important to a company or that impacts its core business is a matter of significance. *See, e.g.*, *Roe-Midget.*, 512 F.3d at 874 (making decisions that impact damage estimate and insurance settlements, such as whether actual damage is consistent with claimed damage, are judgment calls with respect to matters of significance for an insurer); *Owens*, 2019 U.S. Dist. LEXIS at *22 (employee's role in managing projects, including auditing clients, was important to employer and its operations).

Here, the undisputed record evidence shows that Plaintiff exercised discretion and independent judgment on a regular basis and that her work was a matter of significance to both BSI and its customers. Thus, BSI has satisfied the third prong of the administrative exemption.

### III. CONCLUSION

Based on the arguments set forth above and the undisputed facts in BSI's accompanying Statement Of Material Facts To Which There Is No Genuine Issued To Be Tried, BSI respectfully requests that the Court enter summary judgment in its favor on Plaintiff's individual FLSA and IMWL claims and dismiss her Complaint in its entirety.

Respectfully submitted this 15th day of July, 2019.

01528731-1

BSI GROUP AMERICA INC.

/s/Raanon Gal
Raanon Gal (Admitted *Pro Hac Vice*)
Joseph M. English (Admitted *Pro Hac Vice*)
Deborah J. Livesay (Admitted *Pro Hac Vice*)

TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
(770) 434-6868 Telephone
(770) 434-7376 Facsimile
rgal@taylorenglish.com
jenglish@taylorenglish.com
dlivesay@taylorenglish.com

-AND-

Jeffrey T. Karek
IL Bar No. 6286547
MAURICE WUTSCHER LLP
The Loop Center Building
105 W. Madison Street, 18th Floor
Chicago, Illinois 60602
(224) 518-4446 Telephone
(312) 284-4751 Facsimile
jkarek@MauriceWutscher.com

01528731-1

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing **Defendant's Memorandum In Support Of Its Motion For Summary Judgment** with the Clerk of the Court using the CM/ECF System, which sent notification of such to the following counsel of record:

>James B. Zouras (jzouras@stephanzouras.com)
>Ryan F. Stephan (RStephan@stephanzouras.com)
>Haley Renee Jenkins (hjenkins@stephanzouras.com)
>Stephan Zouras, LLP
>100 N. Riverside Plaza, Ste. 2150
>Chicago, Illinois 60606

Dated the 15th day of July, 2019

>BSI GROUP AMERICA INC.
>/s/ Raanon Gal
>Raanon Gal (Admitted *Pro Hac Vice*)
>TAYLOR ENGLISH DUMA LLP
>1600 Parkwood Circle, Suite 200
>Atlanta, Georgia 30339
>(770) 434-6868 Telephone
>(770) 434-7376 Facsimile
>rgal@taylorenglish.com
>
>*Attorneys for BSI Group America Inc.*