# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARIA WILLIAMS-BELL, on behalf of herself, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRITISH STANDARDS INSTITUTION, INC.<br><br>Defendant. | No. 18-cv-05386<br><br>Judge John F. Kness |

## MEMORANDUM OPINION AND ORDER

In the world of commerce, "quality management systems"—which essentially are collections of accepted and standardized management processes—are considered valuable tools to help meet customers' needs and ensure their satisfaction. Over time, enterprises around the world have also come to value certifications that provide objective assurance to the public that a given company's quality management systems meet accepted criteria. These certifications are provided by independent entities that audit companies for compliance with applicable norms—standards that are most frequently promulgated by an international body known as the International Organization for Standardization.

Third party certification bodies, of course, need employees to conduct the audits that determine whether a certification of compliance is warranted. At issue in this case is whether a former employee of one of these certification bodies was illegally

denied overtime compensation for auditing work she did on behalf of her employer. Plaintiff Maria Williams-Bell brought this suit against her former employer, BSI Group America, Inc. ("BSI") (improperly named in the complaint as "British Standards Institution, Inc.") alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 209, *et seq.* and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 501/1, *et seq.* Before the Court presently is BSI's motion for summary judgment.

As explained below, Williams-Bell meets the Department of Labor's definition of an "administrative" employee. As a result, she is exempt from the FLSA's overtime wage requirements, and BSI is thus entitled to summary judgment. Because the Court's grants BSI's motion for summary judgment, Williams-Bell's motion for conditional certification of a collective action (Dkt. 30) is denied as moot.

**I. BACKGROUND**

From a review of the parties' respective submissions, the Court has drawn the following summary of undisputed material facts.[1] Plaintiff Maria Williams-Bell worked as an "ISO 9001 Quality Assurance Auditor" (also referred to as a "Client Manager") for BSI from September 2017 until she resigned in February 2018. Defendant's Statement of Material Facts ("DSOF"), Dkt. 43-9 ¶ 1; Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Resp. DSOF"), Dkt. 57 ¶ 1. ISO 9001 is a quality management system ("QMS") standard maintained by the

---

[1] At the summary judgment stage, the court views the facts, and any inferences to be drawn from them, in the light most favorable to Williams-Bell as the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

International Organization for Standardization—known more commonly as "ISO."[2] DSOF ¶ 5; Pl.'s Resp. DSOF ¶ 5. Accredited registration certification bodies known as "registrars" administer the standard. *Id.* BSI is one such registrar. DSOF ¶ 6; Pl.'s Resp. DSOF ¶ 6. As a registrar, BSI is regulated and certified by a certifying body that ensures it follows relevant standards when auditing clients for compliance with ISO 9001. DSOF ¶ 7; Pl.'s Resp. DSOF ¶ 7. An ISO 9001 certification demonstrates that an independent objective assessment of the client's QMS has been conducted and that the client is achieving the policies and objectives of that management system. DSOF ¶ 18; Pl.'s Resp. DSOF ¶ 18.

As an ISO auditor, Williams-Bell audited BSI's clients for conformance with ISO 9001. DSOF ¶ 9; Pl.'s Resp. DSOF ¶ 9. Depending on the size and complexity of the client, Williams-Bell either conducted an audit alone or as part of an audit team. DSOF ¶ 24; Pl.'s Resp. DSOF ¶ 24. When designated as the lead auditor for an audit team, Williams-Bell supervised the audit and assigned tasks to the other Client Managers. DSOF ¶ 25; Pl.'s Resp. DSOF ¶ 25. When conducting an audit, Plaintiff would review a client's entire QMS, including all its quality control processes (except financial controls). DSOF ¶ 25; Pl.'s Resp. DSOF ¶ 25. To do this, Williams-Bell followed a manual called *Conducting a BSI Assessment* ("BSI Manual"). Plaintiff's Statement of Additional Facts ("PSOF"), Dkt. 58 ¶ 5; Defendant's Response to

---

[2] "ISO" is not an acronym. According to ISO's website, because International Organization for Standardization "would have different acronyms in different languages . . . , [ISO's] founders decided to give it the short form ISO. ISO is derived from the Greek 'isos,' meaning equal. Whatever the country, whatever the language, we are always ISO." *See* https://www.iso.org/about-us.html ("It's All in the Name") (visited March 27, 2021).

Plaintiff's Statement of Additional Facts ("Def.'s Resp. PSOF"), Dkt. 64 ¶ 5. Although the parties dispute just how strictly Williams-Bell and other auditors were required to follow the guidelines in the BSI Manual when conducting an audit, Williams-Bell testified at her deposition that, as an experienced auditor, she had "a good eye for what was conforming and what wasn't conforming" with the ISO 9001 standard. DSOF ¶ 41; Pl.'s Resp. DSOF ¶ 41.

Conducting an ISO 9001 audit included many different elements, such as (1) coordinating the logistics of the audit with the client at a pre-assessment meeting; (2) identifying which processes to review; (3) preparing audit plans; (4) reviewing all relevant processes within the organization; (5) identifying which individuals to interview; (6) identifying areas of nonconformance with the ISO 9001 standard; (7) identifying areas of improvement; (8) reviewing clients' corrective action plans; (9) deciding whether to accept or reject clients' corrective action plans; (10) preparing and reviewing audit reports; (11) making recommendations on ISO 9001 certification to BSI's technical review committee; and (12) scheduling follow-up audits with the client. DSOF ¶¶ 30, 32, 33, 35, 42, 51, 53, 57, 58; Pl.'s Resp. DSOF ¶¶ 30, 32, 33, 35, 42, 51, 53, 57, 58.

Williams-Bell had little direct supervision when performing her duties. Upon completion of an audit, Williams-Bell prepared a post-audit report and made recommendations to a technical review committee at BSI as to whether the customer should be certified under the ISO 9001:2015 standard. DSOF ¶ 57-58; Pl.'s Resp. DSOF ¶ 57-58. BSI's technical review committee would then make the final decision

4

whether to issue an ISO 9001 certification to a client. DSOF ¶ 59; Pl.'s Resp. DSOF ¶ 59. Other than these communications with the committee, Williams-Bell did not have day-to-day contact with her direct supervisor and generally communicated with the supervisor by telephone or email about once a week. DSOF ¶ 26; Pl.'s Resp. DSOF ¶ 26.

Williams-Bell voluntarily resigned her employment with BSI on February 28, 2018 and brought this action against BSI on August 8, 2018. DSOF ¶ 1; Pl's Resp. DSOF ¶ 1; Dkt. 1. Williams-Bell moved for conditional certification as a collective action, and BSI moved for summary judgment on both of Williams-Bell's claims. Dkt. 30; Dkt. 43.

## II.  LEGAL STANDARD

Summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."

5

*Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378.

### III.   DISCUSSION

Williams-Bell brings claims under both the FLSA and the IMWL. A violation of the IMWL is contingent upon a violation of the FLSA. *See* 820 ILCS 105/4a(2)(E). Thus, if Williams-Bell's "FLSA claims fail, [her] related state law claims under the IMWL must fail as well." *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 376 (7th Cir. 2005). Accordingly, the Court frames its analysis of Williams-Bell's claims under the FLSA. *See Condo v. Sysco Corp.*, 1 F.3d 599, 601 n. 3 (7th Cir. 1993); *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011) ("The FLSA is relevant to plaintiffs' IMWL claims because the IMWL parallels the FLSA, and the same analysis generally applies to both statutes").

The FLSA requires employers to pay overtime wages for any hours worked in excess of 40 per week. 29 U.S.C. § 207. An employee engaged in a "bona fide . . . administrative . . . capacity," however, is not eligible for the FLSA's overtime protections. 29 U.S.C. § 213(a)(1). Under Department of Labor ("DOL") regulations, the administrative exemption applies to employees (1) who earn a salary of at least $684 per week;[3] (2) "[w]hose primary duty is the performance of office or non-manual

---

[3] The Court recognizes that, at the time of Williams-Bell's employment at BSI, the applicable exempt wage was $455 per week. Although it does not change the Court's analysis, effective January 1, 2020, the pay threshold increased from $455 per week to $684 per week. *Compare* 29 C.F.R. § 541.300(a)(1) (2018) *with* 29 C.F.R. § 541.300(a)(1) (2020). Regardless, the parties do not dispute that Williams-Bell's weekly salary was about $1,250 per week: well

6

work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). Applying this regulation requires "a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer–LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012). An employer asserting that the administrative exemption applies "ordinarily must show that the employee's work satisfies all three criteria." *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1052 (7th Cir. 2020). These exemptions "must be given a fair, not a narrow, reading." *Id.* (citing *Encino Motorcars, LLC v. Navarro*, — U.S. —, 138 S. Ct. 1134, 1142 (2018)).

The DOL regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Assessment of an employee's duties is holistic and must consider "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* Relevant factors to consider when determining an employee's primary duty include the relative importance of the exempt duties, the amount of time spent on exempt work, and the employee's freedom from direct supervision. *Id.*

It is undisputed that Williams-Bell's primary duty was conducting ISO 9001 certification audits or assessments of BSI's clients. *See* Dkt. 43-1 at 5; Dkt. 56 at 7; Pl.'s Resp. DSOF ¶ 4. As discussed in greater detail below, the parties dispute the

---

in excess of the necessary amount under either the 2018 or the 2020 version of the DOL regulation. DSOF ¶ 70; Pl.'s Resp. DSOF ¶ 70.

7

*characterization* of this primary duty—that is, whether the primary duty is administrative in nature such that the administrative exemption applies. The ultimate question of whether Williams-Bell's work qualifies for the administrative exemption under the FLSA, however, is a question of law. Because there is no genuine dispute as to what constituted Williams-Bell's primary duty, BSI's summary judgment motion is ripe for adjudication. *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 869 (7th Cir. 2008) ("Determining the duties encompassed by an employee's position is a question of fact; determining the appropriate FLSA classification is a question of law").

Accordingly, the Court must examine each of the three criteria in 29 C.F.R. § 541.200(a) to determine if Williams-Bell qualifies for the administrative exemption. As to the first criterion (the salary requirement), the parties do not dispute that Williams-Bell earned a salary of at least $684 per week. DSOF ¶ 70; Pl.'s Resp. DSOF ¶ 70. The Court must thus determine whether, as a matter of law, the undisputed facts demonstrate that William-Bell's primary duty (which, as stated above, the parties agree is conducting ISO 9001 certification assessments of BSI's clients) was non-manual and was directly related to the to the management or general business operations BSI or its customers and included "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

### A. *Duties Directly Related to the Management or General Business Operations of BSI or Its Customers*

To meet the second element of the administrative exemption, BSI must

8

demonstrate that Williams-Bell's primary duty was "non-manual work directly related to the management or general business operations of [BSI] or [its] customers." 29 C.F.R. § 541.200(a)(2). The parties do not dispute that Williams-Bell's work for BSI was non-manual. DSOF ¶ 71; Pl.'s Resp. DSOF ¶ 71. As to the direct-relation question, the DOL regulations define "directly related to the management or general business operations" as work that is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Examples of this type of work include:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

*Id.* § 541.201(b).

Williams-Bell argues that her primary duty does not fit under any of these categories and that she is more properly understood as a "production" employee because she "produced" ISO assessments, which is "the very service BSI itself offers to its customers, and the service from which BSI obtains its revenue." Dkt. 56 at 7. *See Schaefer-LaRose,* 679 F.3d at 574 ("when an employee is engaged in the core function of a business, his or task is not properly categorized as administrative"); *Bigger*, 947 F.3d at 1053 ("whether a duty is exempt may turn on the enterprise's core function—that is, the central revenue generator—and the employee's involvement in it"). BSI does not dispute that conducting ISO 9001 audits is a core component of its

9

business or that Williams-Bell's primary duty included conducting those audits, but counters that even if Williams-Bell were properly considered a "production employee" who "produced" ISO 9001 audit certifications (a point that it does not concede), her duty of conducting ISO assessments is directly related to the management or business operations of BSI's *clients* and thus meets the second element of the DOL regulation's definition of administrative employees. Dkt. 64 at 3; PSOF ¶ 13; Def.'s Resp. PSOF ¶ 13.

BSI is correct. The applicable DOL regulation makes clear that the administrative exemption applies to employees whose work directly relates "to the management or general business operations of the employer *or the employer's customers*." 29 C.F.R. § 541.200(a)(2) (emphasis added). In *Roe-Midgett*, for example, the Seventh Circuit held that the plaintiffs—employees working as insurance claims adjusters for the defendant, a company that contracted with insurance companies to provide claims processing services—were administrative employees. *Roe-Midgett*, 515 F.3d at 867. Because claims adjusting was ancillary to the production of the insurance policies the clients sold, the Seventh Circuit concluded that the plaintiffs' primary duty of adjusting insurance claims was directly related to the general business operations *of the defendant's clients. Id.* at 872. *Roe-Midgett* also explained the DOL regulations establish that "insurance claims adjusters generally meet the duties requirements for the administrative exemption, *whether they work for an insurance company or other type of company.*" *Id.* (emphasis in original) (quoting 29 C.F.R. § 541.203(a)).

10

Similarly, Williams-Bell's primary duty of conducting ISO 9001 certification audits, though a core component of BSI's business, is ancillary to the businesses of BSI's customers. Those customers hire BSI to conduct an audit with the goal of obtaining ISO 9001 certification. BSI's business is thus, in a sense, the "production" of ISO 9001 certifications for its clients, and Williams-Bell, whose primary duty included conducting audits, could be viewed as "producing" those certifications. But the core business of BSI's *clients* is not to produce ISO certifications. Williams-Bell testified that BSI's clients may want ISO 9001 certification for any number of reasons, including to "help [the client] to get customers" or because the client has customers that require ISO 9001 certification to do business with that client. DSOF ¶¶ 16-17; Pl.'s Resp. DSOF ¶¶ 16-17. The duty of conducting audits for the purpose of ISO certification is ancillary to BSI's clients' businesses, and thus falls on the administrative side of the "administrative-production dichotomy." *See Roe-Midgett*, 512 F.3d at 872.

Even though the DOL regulations expressly provide that an employee may qualify for the administrative exemption if her work relates to the management or general business operations of her employer's customers, Williams-Bell argues that her work cannot be considered administrative because BSI has failed to produce any evidence that she acted as an "adviser or consultant" to BSI's clients. Dkt. 56 at 9. BSI counters that Williams-Bell's work is exempt because it is akin to "auditing," one of the categories of work the DOL regulations consider as "directly related to management or general business operations." 29 C.F.R. § 541.201(b). In support, BSI

11

relies heavily on a case from the Northern District of Texas, *Owens v. Neovia Logistics, LLC*, No. 17-CV-1719-G-BK, 2019 WL 1411792, at *1 (N.D. Tex. Mar. 14, 2019), *report and recommendation adopted*, No. 3:17-CV-1719-G (BK), 2019 WL 1405483 (N.D. Tex. Mar. 28, 2019), *aff'd sub nom. Owens v. Neovia Logistics, L.L.C.*, 816 F. App'x 906 (5th Cir. 2020) (nonprecedential disposition).

In *Owens*, the plaintiff worked as a "continuous improvement supervisor" for the defendant employer, a company that marketed "continuous improvement solutions" to its clients with the goal of helping the clients find cost savings in their operations. *Id.* at *1. The plaintiff's role "was to analyze the operations of various clients' facilities and determine how to improve those operations." *Id.* at *2. As part of that role, the plaintiff's primary duties included "inspecting and auditing to determine if operational process were in alignment with prescribed certification standards and procedures." *Id.* at *6. Because the plaintiff's work with his employer's clients "involved, among other things, audits and quality control[,]" which "constitute 'work directly related to management or general business operations,'" the court found that the plaintiff's work qualified for the administrative exemption. *Id.* (alterations accepted) (citing 29 C.F.R. § 541.201(b)).

BSI argues that Williams-Bell's work is like that of the plaintiff in *Owens* because it involved auditing—one of the functional areas identified in 29 C.F.R. § 541.201(b). Dkt 43-1 at 7-8. Williams-Bell counters that, because the relevant work involved "determining how to make Defendant's customers' businesses run more efficiently" such that the plaintiff could "properly be designated as an

12

adviser/consultant," *Owens*, 2019 WL 1411792 at *6 n. 7, *Owens* is distinguishable. Dkt. 56 at 5. Although it is true that the *Owens* plaintiff's duties do not appear to be an exact mirror of Williams-Bell's duties—the *Owens* plaintiff may have had more of an advisory or consulting role than did Williams-Bell—*Owens* did not rest solely on the plaintiff's advisory role. Rather, the court made clear that the plaintiff's primary duties of auditing and quality control were "work directly related to that management of general business operations" of the employer's *clients*, thus bringing the plaintiff's work under the administrative exemption. *Id.* at 6.

*Owens* is not binding, but its reasoning is persuasive. As with the plaintiff in *Owens*, William-Bell's duties involved auditing clients' systems, specifically quality management systems. The purpose of a quality management system is to ensure that an organization's product or service, regardless of the industry and regardless of the type of product or service being produced or provided, meets the necessary level of quality and is thus undeniably a part of a client's "general business operations." Because Williams-Bell's primary duty can be properly understood as auditing—work specifically contemplated by the DOL regulations as work related to management of general business operations—her work qualifies for this element of the administrative exemption.

Reviewing the evidence in the light most favorable to Williams-Bell, the Court finds that no genuine issue of material fact exists regarding whether her primary duties at BSI directly related to the management or general business operations of BSI's clients. Accordingly, the Court finds that BSI has met its burden of proving the

13

second element of the administrative exemption test.

### B. *Exercise of Discretion and Independent Judgment with Respect to Matters of Significance*

To qualify for the administrative exemption, Williams-Bell's primary duty of conducting ISO 9001 certification audits must also involve "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). There is no question that Williams-Bell's work involved "matters of significance," as conducting ISO 9001 certification audits was, as discussed above, at the very crux of BSI's business. *See* 29 C.F.R. § 541.202(a) ("The term 'matters of significance' refers to the level of importance or consequence of the work performed"). The primary issue is thus whether Williams-Bell's duties involved "the exercise of discretion and independent judgment."

In determining whether an employee exercises independent discretion and independent judgment, agency regulations provide various factors to consider:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; . . . whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . whether the employee provides consultation or expert advice to management; [and] whether the employee is involved in planning long- or short-term business objectives. . . .

*Id.* § 541.202(b). This list of factors, however, "is not a checklist; it is a guide." *Schaefer-LaRose*, 679 F.3d at 582. Exercising discretion and independent judgment "implies that the employee has authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). But employees may

14

satisfy this qualification "even if their decisions or recommendations are reviewed at a higher level." *Id.*

In addition, exercise of discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e). Employees who merely "grade, classify, or otherwise determine whether specified standards are met[] are not exercising discretion or independent judgment for purposes of the administrative exemption." *Roe-Midgett*, 512 F.3d at 873. In general, the exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).

Williams-Bell argues that she fits into the category of merely grading or classifying because she does nothing more than "follow [BSI's] strict, step-by-step policies from start to finish" when conducting an ISO certification audit. Dkt. 56 at 13. It is undisputed that BSI's auditors followed the policies in the BSI Manual to perform ISO 9001 certification audit. PSOF ¶ 5; Def.'s Resp. PSOF ¶ 5. Regardless of the type or size of the client being assessed, the BSI Manual provides the structure for conducting an audit. Dkt. 57-2. As Timothy Green, BSI's Vice President of Operations for the Americas testified at his deposition:

> The procedures and processes [in the BSI Manual] provide the structure by which they do the audit. Once they arrive on-site, the structures and procedures define their responsibilities. But from the moment they arrive on-site, they are responsible for identifying who they talked to, the audit trails that they follow, the decisions that they make. So the procedures and policies are there to provide structure for the day.

15

Transcript of May 15, 2019 Deposition of Timothy Green, Dkt. 43-4, at 65:15 - 66:1.

Merely that Williams-Bell was obligated to follow the framework in the BSI Manual did not mean that she was necessarily precluded from exercising discretion and independent judgment in her role. On the contrary, the very nature of the work at issue—auditing—necessitated the use of a standard; after all, a standard is, by definition, a fixed set of criteria used to measure something. *See Standard*, Merriam-Webster Dictionary Online, *available at* https://www.merriam-webster.com/dictionary/standard, (last visited Mar. 29, 2021) ("something established by authority, custom, or general consent as a model or example; something set up and established by authority as a rule for the measure of quantity, weight, extent, value, or quality"). It would have been impossible for Williams-Bell to audit a client against a standard (in this case, the ISO 9001 standard) without having a standard at hand.

It takes no great leap to assume that most vocations (or avocations) require some sort of adherence to guidelines or rules. To throw a strike in baseball, for example, a pitcher must throw the ball from a spot at least sixty feet, six inches from home plate and must fit the pitch within an imaginary block of space above the plate. But so long as that framework is heeded, it is up to the pitcher whether to throw overhand or sidewinder, heat or off-speed, down the middle or on the corners.

Like many other professionals (even a pitcher), Williams-Bell was able to exercise discretion and independent judgment even though she was required to work within a well-established and binding framework. *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374-75 (7th Cir. 2005) (that employee must follow "a highly

16

regimented set of rules" does not prevent employee from exercising discretion and independent judgment); *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 526 (5th Cir. 1999) (existence of standard procedures and guidelines does not mean employee's responsibilities do not require exercise of independent discretion).

More precisely, the factual record shows Williams-Bell was able to exercise discretion and independent judgment before, during, and after her audits while still adhering to the guidelines in the BSI Manual. Before beginning an audit, Williams-Bell needed to create an audit plan, which she described at her deposition as "a detailed schedule of what will be reviewed" during the audit, including "the processes that will be reviewed, the people that will be interviewed," and "a time frame for when those things will be reviewed." Pl. Tr. 106:8-19. To create this audit plan, Williams-Bell considered "many, many different factors," including the finding of any previous audits, the amount of time needed to complete the audit, and which employees she would need to interview. *See id*. 107:25-111:13. When determining which employees to interview as part of an audit, Williams-Bell first reviewed the client's processes that made up the QMS. Then, within each one of those processes, Williams-Bell selected the key employees, including both managers and "day-to-day" workers, who would be able to give her "an overall review of how the process works." *Id*. 153:15-154:9.

To determine whether a client's practices conformed to the standard, Williams-Bell reviewed records, observed practices, interviewed employees, and sampled processes. *Id*. 58:12-20. Williams-Bell testified at her deposition that, as an

17

experienced auditor, she had "a good eye for what was conforming and what wasn't conforming." DSOF ¶ 41; Pl.'s Resp. DSOF ¶ 41.

This testimony refutes Williams-Bell's argument that her work was nothing more than a mechanical, formalistic application of the guidelines in the BSI Manual. Rather, this work, and the judgment Williams-Bell used to perform it, was vastly different from the "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work" that the DOL regulations contemplate as tasks indicative of a lack of discretion and independent judgment. 29 C.F.R. § 541.202(e).

Williams-Bell testified that as part of the audit process, she was also responsible for identifying both non-conformances (areas where the client did not meet the ISO 9001 standard) and "opportunities for improvement" (areas where, even though the client conformed to the ISO 9001 standard, the client "could do a better job" at meeting the ISO requirements). Pl. Tr. 57:11-58:20, 119:9-21, 149:5-12. If Williams-Bell issued a noncomformance, the client was required to submit a corrective action plan describing the steps it would take to fix the noncomformance. *Id*. 157:3-14. Although she did not advise or instruct the client on how to fix the nonconformance, Williams-Bell was responsible for either approving or disapproving the client's corrective action plan. *Id*. If the client were undergoing a certification exam, the client could not be certified as conforming with ISO 9001 unless Williams-Bell approved the proposed corrective action plan. *Id*. 155:16-22. Williams-Bell was thus required to use her discretion and independent judgment to determine if the

18

correction plan was acceptable.

Finally, Williams-Bell argues that she lacked discretion because the BSI technical committee reviewed her assessment reports and made the ultimate decision on whether the client received ISO certification. Dkt. 56 at 14; PSOF ¶ 17, Pl.'s Resp. DSOF ¶ 37. Although the exercise of discretion and independent judgment "implies that the employee has authority to make an independent choice, free from immediate direction or supervision[,]" an employee may satisfy this qualification "even if [her] decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). That the technical committee reviewed Williams-Bell's work does not, therefore, necessarily mean she was unable to exercise discretion and independent judgment. Moreover, the undisputed record also shows that Williams-Bell had little day-to-day interaction with her supervisor. Williams-Bell worked on-site at client locations or at home and only communicated with her supervisor by telephone or email about once a week. DSOF ¶¶ 26, 71; Pl.'s Resp. DSOF ¶¶ 26, 71.

Viewing this evidence in the light most favorable to Williams-Bell, the Court is satisfied that, even though Williams-Bell may have had supervisors reviewing her work, she was still free from "immediate direction or supervision" to such a degree what she was able to exercise discretion an independent judgment. *See Mullins v. Target Corp.*, No. 09 C 7573, 2011 WL 1399262, at *7 (N.D. Ill. Apr. 13, 2011) (plaintiff exercised discretion and independent judgment where she was able to make "choices and decisions that were free from *immediate* supervision and direction[,]" even though she was required to obtain her supervisor's approval at various points during

19

the course of her work).

BSI has thus demonstrated that there is no triable issue as to whether Williams-Bell's duties include the exercise of discretion and independent judgment with respect to matters of significance. Williams-Bell's role required more than simply "applying well-established techniques, procedures or specific standards described in manuals," and did not involve simple "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." 29 C.F.R. § 541.202(e).

Because Williams-Bell was compensated on a salary or fee basis at a rate of not less than $684 per week, her primary duty was the performance of non-manual work directly related to the general business operations of BSI's clients, and her primary duty included the exercise of discretion and independent judgment with respect to matters of significance, the Court holds there is no genuine issue that Williams-Bell was an exempt administrative employee.

## IV. CONCLUSION

For the reasons provided above, BSI's motion for summary judgment (Dkt. 43) is granted. Because the Court grants BSI's motion for summary judgment, Williams-Bell's motion for conditional certification of a FLSA collective action (Dkt. 30) is denied as moot.

SO ORDERED.

Date: March 31, 2021

JOHN F. KNESS
United States District Judge